[Cite as *In re I.M.*, 2012-Ohio-3847.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

IN THE MATTER OF: I.M.          :

:         C.A. CASE NO.    2012 CA 20

:         T.C. NO.    20100329

:         (Civil appeal from Common
            Pleas Court, Juvenile Division)

:

:

. . . . . . . . . .

**O P I N I O N**

Rendered on the     24th     day of     August    , 2012.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
      Attorney for Plaintiff-Appellee

BROOKE M. BURNS, Atty. Reg. No. 0080256, Assistant State Public Defender, 250 E. Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

    **{¶ 1}** I.M. appeals from a judgment of the Clark County Court of Common

Pleas, Domestic Relations Division, Juvenile Section, which revoked her parole and committed her to the Department of Youth Services "(DYS") for a minimum period of 90 days. I.M. claims that the length of her commitment should have been for a minimum period of 30 days and that the trial court should have appointed a guardian ad litem for her due to her father's conflict of interest.

{¶ 2} For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded to the trial court for the entry of a modified judgment that eliminates the phrase "for a minimum term of 90 days."

I.

{¶ 3} In March 2010, I.M. was adjudicated a delinquent child based on her admission to conduct that constituted gross sexual imposition if committed by an adult; I.M. was 13 years old at the time of the alleged conduct, and the victim was her nine-year-old half-sister. As a result of plea negotiations, a second gross sexual imposition complaint concerning another half-sister was dismissed. The trial court committed I.M. to DYS, but suspended the commitment and placed her on probation, subject to the court's care and control but with her father retaining legal custody. I.M. and her family were notified of the terms of her probation. I.M. was placed by the court with Village Network.

{¶ 4} In October 2010, the court was notified that I.M. had violated the terms of her probation by failing "to accomplish her counseling objectives successfully by not actively participating in her juvenile sex offender therapy at Village Network." I.M. admitted the violation. The trial court committed her to the Clark County Juvenile Detention Center for seven days and continued her probation.

**{¶ 5}** In May 2011, another complaint was filed alleging that I.M. had violated the conditions of her probation. I.M. admitted the violation, and the trial court committed her to the custody of DYS for an indefinite term consisting of a minimum of six months and for a maximum period not to exceed her 21st birthday. I.M. appealed the trial court's judgment, but later voluntarily dismissed her appeal. *In re I.M.*, 2d Dist. Clark No. 2011 CA 53.

**{¶ 6}** I.M. was released to DYS supervision ("parole") after serving the minimum six months of commitment. In January 2012, I.M. was brought before the court for a review hearing based on allegations that she had exhibited inappropriate sexual behavior toward male staff members at the Humane Society, where she was to perform community service. The court continued I.M.'s parole and ordered her to complete 20 hours of community service at St. Vincent de Paul.

**{¶ 7}** In February 2012, I.M.'s parole officer filed a notice of parole violation with the court. The allegation stated: "On January 27, 2012, [I.M.] was suspended from Keifer Alternative School for fighting. [I.M.] was in court January 4, 2012 for a review hearing and since that time she has had over 5 Discipline Referral[s] for refusal to work, cursing at teachers, and disruption of class. [I.M.] has a very negative attitude and when is confronted by any type of authority becomes loud and verbally abusive."

**{¶ 8}** A hearing on the parole violation was held on February 24, 2012. I.M.'s father and parole officer attended the hearing. I.M. appeared without counsel. The trial court discussed with I.M. and her father whether they wanted to have a lawyer; I.M.'s father indicated that he did not intend to obtain counsel for I.M., and after a lengthy discussion

with the court, I.M. waived her right to counsel.   I.M. then entered an admission to violating her parole.   The trial court orally revoked her parole and ordered her returned to DYS commitment.   The trial court's subsequent judgment entry provided, in part:

> The court revokes the parole of the youth.
>
> The youth is to be returned to the Ohio Department of Youth Services for a minimum term of 90 days.
>
> It is further order of the court, that the youth shall complete appropriate juvenile sex offender counseling before she is returned to the community.

{¶ 9}   I.M. appeals from the revocation of her parole, raising two assignments of error.   We will address them in reverse order.

## II.

{¶ 10}   In her second assignment of error, I.M. claims that "[t]he trial court committed plain error when it failed to appoint a guardian ad litem for [her], in violation of R.C. 2151.281(a) and Juvenile Rule 4(b)."

{¶ 11}   R.C. 2151.281(A) provides: "The court shall appoint a guardian ad litem, subject to rules adopted by the supreme court, to protect the interest of a child in any proceeding concerning an alleged or adjudicated delinquent child or unruly child when either of the following applies: * * *   (2) The court finds that there is a conflict of interest between the child and the child's parent, guardian, or legal custodian."   Juv.R. 4(B) likewise requires the appointment of a guardian ad litem to protect a child's interests when "[t]he interests of the child and the interests of the parent may conflict."

{¶ 12}   "A trial court's failure to appoint a guardian ad litem when required by R.C.

2151.281(A) and Juv.R. 4(B) amounts to reversible error." *In re K.J.F.*, 2d Dist. Clark No. 2003-CA-41, 2004-Ohio-263, ¶ 23, citing *In re Sappington*, 123 Ohio App.3d 448, 452, 704 N.E.2d 339 (2d Dist.1997) and *In re Spradlin*, 140 Ohio App.3d 402, 406, 474 N.E.2d 877 (4th Dist.2000). We previously addressed the trial court's obligation to appoint a guardian ad litem as follows:

> In *Sappington,* this Court addressed the issue of what degree of conflict requires an appointment of a guardian ad litem such that the failure to do so amounts to reversible error. *Id.* at 452-454, 704 N.E.2d 339. In *Sappington,* we held an actual conflict of interest is not required in order for the need to arise for the appointment of a guardian ad litem under Juv.R. 4(B). *Id.* at 453, 704 N.E.2d 339. However, we stated that a trial court is in the best position to determine whether a potential conflict of interest exists between a parent and a child. *Id.* at 453-454, 704 N.E.2d 339. Therefore, we held that an abuse of discretion standard should apply. *Id.* at 454, 704 N.E.2d 339. Specifically, reversible error exists if the record reveals "a strong enough possibility of conflict of interest between parent and child to show that the juvenile court abused its discretion by not so finding." *Id.* In *Sappington,* we reversed the judgment of a juvenile court when it failed to appoint a guardian ad litem to represent the minor where the parents had previously filed domestic violence charges against the minor, had sought to place the child out of the home, and had convinced the minor that he did not need an attorney. *Id.* at 454-455, 704 N.E.2d 339.

Additionally, a reviewing court should consider whether the minor was represented by counsel before the trial court. *Id.* at 455, 704 N.E.2d 339. Juv.R. 4(C)(1) provides that if the appointed guardian ad litem is an attorney licensed to practice in Ohio, "the guardian may also serve as counsel to the ward providing no conflict between the roles exist."

*In re K.J.F.* at ¶ 24-25.

{¶ 13} In *In re K.J.F.*, we held that the trial court should have appointed a guardian ad litem for all of the child's delinquency-related proceedings, which included his original adjudication and subsequent revocation of probation for the rape of his half-sister. In that case, K.J.F.'s stepfather had stated at the initial arraignment proceedings that the family did not want K.J.F. to return to their home where the victim was; the trial court had noted the conflict of interest at that time, but did not appoint a guardian ad litem. K.J.F.'s mother informed the court in a letter, which the court acknowledged receiving, that she "did not feel [she] could make choices in [K.J.F.'s] best interest." The child's mother had expressed dissatisfaction with her son's original appointed counsel, and K.J.F. later appeared without counsel. We concluded:

In this case, there certainly was a strong enough possibility of a conflict of interest between K.F. and his parents that the trial court should have appointed a guardian ad litem. K. F.'s parents were torn between K. F., with whom they had struggled for years over his behavioral problems, and their four year old daughter whom he had raped. This conflict of interest was even acknowledged by the magistrate at the first arraignment hearing and yet

the court did not appoint a guardian ad litem. We can only find that failing to appoint a guardian ad litem to oversee K. F.'s best interests was an abuse of discretion.

{¶ 14} In the case before us, the trial court appointed counsel and a guardian ad litem for I.M.'s original delinquency hearing, and a plea was reached regarding the gross sexual imposition charges. I.M. had appointed counsel for her probation violation hearing in June 2011, at which time she was committed to DYS for a minimum of six months; I.M.'s father and stepmother attended that hearing. Whether I.M. should have had a guardian ad litem for the June 2011 hearing is not before us.

{¶ 15} At the time of I.M.'s parole revocation hearing, I.M. was residing with her great-grandmother. At the beginning of I.M.'s parole revocation hearing, the trial court asked I.M., who was then 17 years old, whether she had or expected to hire an attorney. She answered, "No." The court then addressed I.M.'s father, as follows:

THE COURT: It might be helpful for her to have a lawyer, sir. Do you have any interest in retaining counsel on her behalf?

FATHER: No. Cause she knows – this has been an ongoing affair –.

THE COURT: Well, I don't know what's going on, if she has any defense. Sometimes lawyers are able to help you decide options and choices, and review rights and possibilities.

FATHER: Her actions are – is nothing – if you'd seen the write ups, your Honor, you would understand where I'm coming from. There's – there's more than five.

THE COURT: Okay.

FATHER: I mean, it's been constant.

{¶ 16} The court then held an extensive discussion with I.M. about whether she had any interest in speaking with a lawyer. I.M. expressed that she did not need to discuss her options with an attorney and that she needed to accept the consequences of her actions. The trial court repeatedly questioned I.M. about her willingness to waive counsel and whether her waiver was knowing and voluntary. I.M. unequivocally stated that she knew she could receive appointed counsel and that she was willing to proceed without a lawyer. I.M. then admitted to the probation violation, explaining that she had gotten into a fight at school even though "I had ample time to get away from the situation before the fight occurred, and I didn't try to get away from it." I.M. admitted that she had violated school rules, cursed at staff, and had difficulty obeying school rules, as alleged in the parole violation complaint. The court and I.M. discussed I.M.'s difficulty in adjusting to living in the community after DYS, the services that had been offered, and I.M.'s reasons for her failure to adjust.

{¶ 17} When the court asked I.M.'s father if he had anything to say, I.M.'s father stated:

I – I don't know. She – she's been given so many different chances. She actually resides with my grandmother, which would be her great grandmother. She's the only child at the house, so it's just her and my grandmother. And inside the house, besides minor little rigamarole that teenagers do as far as like talking back or something like that, she's as good as she can be. She helps my grandma. She does dishes. She helps her

with dishes, you know, helps her with dinner and everything. But as soon as she goes out of sight of an adult, it just all breaks loose.

You know, she was fired from community service at the Humane Society for inappropriate sexual behavior. I took her out of community service that she was doing last time she was in here because I prevented a situation of a sexual thing happening again. And then she turns around and gets suspended from school. They give me some packets for her to do while she was on her 10-day suspension for – before she got her expulsion hearing * * * and she hasn't completed them, at all. So it's – I don't – I don't know what else there is to do for her. I – I love her to death and I'll walk –.

{¶ 18} Although I.M.'s father was also the father of I.M.'s victims, we do not find that this fact necessarily required the trial court to appoint a guardian ad litem for I.M.'s parole revocation hearing. I.M. was living with her paternal great-grandmother while on parole and at that juncture, there was no concern that I.M. would reside with or present a danger to her victims if she were not committed to DYS. I.M.'s father expressed a deep love for his daughter, and he had intervened in her Humane Society and St. Vincent de Paul community service to prevent her from engaging in additional inappropriate conduct. I.M.'s father expressed frustration in not knowing what else he could do for his daughter in light of her continued misbehavior, but there is no indication that his interests were adverse to or in conflict with his daughter's.

{¶ 19} The court also heard from I.M.'s parole officer, who reiterated many of the sentiments that I.M.'s father had expressed. The parole officer stated that I.M. had received

"eleven or so write ups" for "fighting, violence, disobedient and disruptive behavior" at school and that she had engaged in inappropriate behavior while performing community service. The parole officer informed the court that I.M. had given her great-grandmother "a lot of guff" and that I.M.'s attitude "is probably one of the top ten worst I've seen in 20 some years. Just totally resistant to any type of authority, any type of rationale or common sense. She's always in that victim mode." The parole officer further indicated that I.M.'s counselor "just kind of [alluded] to the fact that revocation would probably be a good thing for her. She needs to grow up."

{¶ 20} Based on the record, the trial court could have reasonably concluded that "a strong possibility of a conflict of interest" did not exist between I.M.'s father and I.M. at the parole revocation hearing. The trial court did not abuse its discretion in revoking I.M.'s parole supervision and committing to her to DYS without appointing a guardian ad litem.

{¶ 21} The second assignment of error is overruled.

III.

{¶ 22} In her first assignment of error, I.M. claims that the trial court "committed plain error" when it ordered her to serve a minimum of 90 days of confinement. She asserts that a 30-day minimum commitment is the only commitment term allowed under R.C. 5139.52(F), the applicable statute when parole is revoked. I.M. notes that R.C. 2152.22(E) allows the court to return a youth to DYS commitment for a minimum term of 90 days; however, she emphasizes that R.C. 2152.22(E) applies when the youth is under supervision due to judicial release, not when the youth is under parole supervision. *See* R.C. 5139.52(F).

{¶ 23}  As an initial matter, I.M. employs a plain error analysis in arguing that the trial court erred in ordering a minimum 90 days of confinement.  In *In re T.K.*, 9th Dist. Summit No. 26076, 2012-Ohio-906, the Ninth District used a plain error analysis to review the trial court's imposition of more than 30 days under R.C. 5139.52(F) when the juvenile, who was represented by counsel, failed to object to the length of the revocation in the trial court.  I.M., who was not represented by counsel and did not have a guardian ad litem at the revocation hearing, also did not object to the trial court's imposition of a minimum 90-day period of confinement.

{¶ 24}  Regardless of whether I.M. was represented by counsel, the trial court imposed a minimum 90-day period of commitment in its judgment entry, but did not orally inform I.M. of that period of commitment at the revocation hearing.  Rather, the court concluded the hearing by stating,

> I'll revoke her parole, waive any additional fees and costs, return her to the institution.  We'll try again, [I.M.].  You won't be there for life, so I hope you'll take advantage of the opportunities there and come back a changed young lady.  We continue to remain hopeful.  You can take her to detention.

Because I.M. was not informed of the 90-day minimum period and thus had no opportunity to object, we decline to review I.M.'s assignment for plain error only.

{¶ 25}  R.C. 5139.52(F) provides, in part, that if the court determines that a juvenile made a serious violation of the terms of his supervised release, the court "may revoke the child's supervised release and order the child to be returned to the department of youth services for institutionalization or, in any case, may make any other disposition of the

child authorized by law that the court considers proper." Our reading of this sentence is that the court's sanction options when a juvenile commits a serious violation are either a revocation of the supervised release or another authorized disposition (e.g., half-way house, inpatient drug program, house arrest, confinement in the local juvenile detention facility, etc.).

{¶ 26} The next sentence of R.C. 5139.52(F) states:

If the court orders the child to be returned to a department of youth services institution, the child shall remain institutionalized for a minimum period of thirty days, the department shall not reduce the minimum thirty-day period of institutionalization for any time that the child was held in secure custody subsequent to the child's arrest and pending the revocation hearing and the child's return to the department, the release authority, in its discretion, may require the child to remain in institutionalization for longer than the minimum thirty-day period, and the child is not eligible for judicial release or early release during the minimum thirty-day period of institutionalization or any period of institutionalization in excess of the minimum thirty-day period.

{¶ 27} Read together, these provisions of R.C. 5139.52(F) allow the juvenile court to order the child returned to DYS, where the child shall remain for at least 30 days. The 30-day minimum period is a limitation on DYS's authority to determine the minimum length of the child's commitment once the child is returned to DYS.

{¶ 28} We disagree with the Eighth, Ninth, and Eleventh Districts, which have held that R.C. 5139.52(F) establishes a minimum, not an exact, amount of time for which *the*

*trial court* must recommit the juvenile. *In re A.N.*, 11th Dist. Ashtabula Nos. 2011-A-57 and 2011-A-58, 2012-Ohio-1789, ¶ 12; *In re T.K.* at ¶ 10 (stating R.C. 5139.52(F) "does not limit the court from sentencing" child to DYS for longer than 30 days, not to exceed his 21st birthday); *In re D.B.*, 8th Dist. Cuyahoga No. 97445, 2012-Ohio-2505 (affirming trial court's order that juvenile be returned to DYS custody for a period of not less than three months or until he completed a specialized release program). In our view, the trial court does not "sentence" a juvenile to return to DYS for a prescribed period of time once it revokes the child's supervised release. Rather, the trial court's discretion is limited to determining whether the juvenile's supervision should be revoked and the child returned to the DYS. If the court determines that supervision should be revoked, R.C. 5139.52(F) then operates to ensure "that the child * * * remain[s] institutionalized for a minimum period of thirty days."

{¶ 29} Our interpretation is further supported when R.C. 5139.52(F) is contrasted with R.C. 2152.16, which sets forth the periods of commitment to DYS that apply when a juvenile court adjudicates a child delinquent for committing an act that would be considered a felony if committed by an adult. Under R.C. 2152.16, "the juvenile court may commit" a child to DYS until the age of 21 for an act that would be aggravated murder or murder if committed by an adult. R.C. 2152.16(A)(1)(a). For all other specified acts, however, the law prescribes a specific minimum period (the lowest being six months) and a maximum period ending at age 21. R.C. 2152.16(A)(1)(b)-(e). R.C. 2152.16(A)(2) further provides that, "[i]n each case in which a court makes a disposition under this section, the court retains control over the commitment for the minimum period specified by the court * * *. During

the minimum period, the department of youth services shall not move the child to a nonsecure setting without the permission of the court that imposed the disposition."

{¶ 30} Thus, whereas initial dispositions are expressed as minimum and maximum sentences to be imposed by the juvenile court and the court retains control over the minimum commitment period, R.C. 5139.52(F) expressly limits the juvenile court's discretion to the determination of whether to return the juvenile to DYS, and that statute grants DYS more authority to determine a release date following a parole violation and re-commitment, with the limitation that the juvenile may not be released within the minimum 30-day period.

{¶ 31} Although our rationale differs from that argued by I.M., we agree that the trial court erred in ordering that I.M. be returned to DYS for a minimum term of 90 days.

{¶ 32} The first assignment of error is sustained.

IV.

{¶ 33} The trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded to the trial court for the entry of a modified judgment entry that eliminates the phrase "for a minimum term of 90 days."

. . . . . . . . . .

FAIN, J. and FRENCH, J., concur.

(Hon. Judith L. French, Tenth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Lisa M. Fannin

Brooke M. Burns
Hon. Joseph N. Monnin